UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GOPI NATARAJAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| ALPHA THOUGHT GLOBAL, INC., | § | CIVIL ACTION NO. 3: 04-CV-0475-B |
| | § | |
| Defendant and Third Party Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| ANURAG MEHTA, | § | |
| | § | |
| Third Party Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are: 1) Plaintiff's Motion for Summary Judgment (docket no. 34), filed December 30, 2004; 2) Defendant and Third Party Plaintiff Alpha Thought Global, Inc.'s ("ATG") Motion for Summary Judgment Against Third Party Defendant Anurag Mehta ("Mehta") (docket no. 65), filed March 14, 2005; and 3) ATG's Motion for Summary Judgment against Plaintiff Gopi Natarajan ("Natarajan") (docket no. 68), filed March 14, 2005. For the reasons that follow, the Court DENIES Natarajan's Motion for Summary Judgment, DENIES as moot ATG's Motion for Summary Judgment against Mehta, and GRANTS in part and DENIES in part ATG's Motion for Summary Judgment against Natarajan.

### I.  Factual and Procedural Background

In March 2001, Mehta presented his idea for a medical billing company to Vidhan Chaudhari ("Chaudhari"), an investor and Mehta's relative.  (Def.'s App. in Supp. Mot. Summ. J. Ag. Pl. Gopi

1

Natarajan ["Def.'s App."] at 87-90).  Formed under the name "Alpha Thought, Inc.", the company would provide medical billing services to health care providers.  (Def.'s App. at 91-92).  In August 2002 Alpha Thought Global, Inc. ("ATG"), a related entity, was formed.  (*Id.* at 136-37).  The sole shareholder of ATG is an entity wholly owned by Chaudhari.  (*Id.* at 137).  Mehta became the President and Chief Executive Officer of ATG.  (*Id.* at 12).  The Board of Directors was initially comprised of Chaudhari, Mehta, and Hari Rao, with Chaudhari serving as its Chairman.  (*Id.* at 13, 388).  Benno Disler was added as a Board member in December 2002.  (*Id.* at 388).

In June 2002, Mehta and others at ATG began employment discussions with Natarajan. (Pl.'s App. in Supp. Mot. Summ. J. ["Pl.'s App."] at 5-6, 56; Def.'s App. at 15, 173).  Natarajan was an attractive hire to ATG in light of his significant experience in the health care management service field.  (Pl.'s App. at 4, 56).  Natarajan, Mehta, and Rao negotiated Natarajan's employment terms that were ultimately memorialized in a final Memorandum of Understanding ("MOU") dated August 29, 2002.  (Pl.'s App. at 9, 50-52; Def.'s App. at 188).  The parties agreed that Natarajan would receive a $137,142.00 base salary together with a $102,857.00 guaranteed bonus, bringing his total annual compensation to $240,000.00.  (Pl.'s App. at 13, 50-52).  Natarajan's severance pay was negotiated at $100,000 if he was terminated without cause.  (*Id.* at 51-52).  The MOU stated that the terms and conditions set forth in the MOU were non-binding, but that they would be "incorporated into a formal Employment Agreement."  (*Id.*).

Even though Natarajan understood that he would not be receiving a formal employment agreement prior to commencing work, he nevertheless decided to begin working for ATG, and  his first day on the job was September 16, 2002.  (Def.'s App. at 202-04, 314-17, 207). Although the MOU had provided that Natarajan's title would be Executive Vice President, he was later promoted

to Chief Operating Officer ("COO").  (Pl.'s App. at 12, 51-52, 57).  As COO, Natarajan was an

officer of the company, and ATG's highest paid executive.  (Def.'s App. at 390).

Natarajan made several inquiries about the promised employment agreement.  (Pl.'s App. at

10-11).  Rao was responsible for drafting components of ATG employment agreements, but finalizing

such agreements was not a high priority in light of more pressing problems facing the company.

(Def.'s App. at 141-42).  As time passed, Natarajan grew increasingly frustrated by ATG's failure to

deliver him an employment agreement, and on February 18, 2003, Natarajan, while in India,

allegedly told Mehta that he would resign from ATG if he did not have an employment agreement

upon his return from India.  (Pl.'s App. at 14-15, 58-59).  Responding to Natarajan's threat to quit,

Mehta allegedly drafted the letter which forms the basis of this lawsuit on February 19, 2003.[1] (*Id.*

at 65).  The letter, referred to throughout this order as the "Severance Agreement", provided in

pertinent part:

> Dear Gopi,
>
> First, I want to thank you for all your hard work and dedication to Alpha Thought and for
> the significant efforts you have expended to help our global operations. . . .
>
> I know that your employment contract has not been done, though repeatedly promised by
> the Board, and specifically Hari Rao.  I am also aware that your role has changed significantly
> as well as your compensation elements (i.e. commission payments for Business Development
> related activities) and you are seriously concerned that this change will not allow you to
> potentially earn what you had planned on earning with Alpha Thought.
>
> In light of this, and until your employment agreement is finalized, I do want to assure that
> in the event that your employment with Alpha Thought is terminated, that you will be paid

---

[1]  ATG contends that the February 19, 2003 letter is a fraud and did not come into existence until
after ATG asked both Mehta and Natarajan to resign.  For summary judgment purposes, however, ATG
assumes that the letter was drafted on February 19, 2003.  (ATG's Brief in Supp. Mot. Summ. J. ["ATG's MSJ
Brief"]at 12 n.11).

a severance amount, equal to your total current yearly compensation,[2] for a period of three years (i.e. salary plus bonus).

Leaving a senior position at EDS [Natarajan's previous employer] to join Alpha Thought shows how much enthusiasm and faith you have in our company and our vision. The purpose of this letter is to memorialize the agreement made when we first hired you into the company.

(Pl.'s App. at 23).

Mehta and Natarajan characterized the Severance Agreement as a "stop gap" measure intended to be in place only until an employment agreement was finalized. (Def.'s App. at 230, 252, 32-33). Natarajan contends that he decided not to leave ATG in exchange for the Severance Agreement, and in fact he continued working for ATG for approximately five months after receiving[3] the February 19 letter agreement. (Pl.'s App. at 16-17, 61). Neither Natarajan nor Mehta provided the Severance Agreement to anyone at ATG, nor did they inform anyone at ATG of its existence during Natarajan's tenure with the company. (Def.'s App. at 34, 235-36, 252). Natarajan testified that he "saw no reason" to mention the agreement to Rao, who was responsible for creating executive employment agreements. (*Id.* at 252, 266). Mehta testified that he did not want Rao to see it "[b]ecause he was against everything that I was doing", nor did he want Chaudhari to see it because "[i]t was their responsibility to get the employment agreement done." (*Id.* at 39-40).

During this time ATG was experiencing financial troubles. On January 15, 2003, Natarajan sent e-mails establishing a hiring freeze and stating that "[c]lients [are] constantly threatening to

---

[2] Natarajan's annual compensation was $240,000. Thus he would be entitled to receive $720,000 under the Severance Agreement if his employment with ATG was terminated for any reason.

[3] Natarajan and Mehta have varying accounts as to when Natarajan first received the Severance Agreement. Mehta testified that he provided it to Natarajan within a day or two of writing it (Def.'s App. at 28), while Natarajan believes that he received it in early March 2003. (*Id.* at 229).

4

leave us" and that "revenues appear to be dropping ".  (*Id.* at 245-46, 351, 352, 246-47, 353).  And in February 2003 the company was so cash-starved that Andrew Johnson, ATG's Chief Financial Officer, asked Chaudhari to pour cash into the company; in response Chaudhari provided a $700,000 cash infusion.  (*Id.* at 43-45, 67-71, 72-73, 250-51, 360-61, 371, 385-86).

On July 14, 2003, the ATG Board terminated Natarajan's employment[4], allegedly because he was not performing as expected.  (*Id.* at 151; Pl.'s App. at 18-19).[5]  Natarajan testified that Chaudhari had told him that the company's plan to migrate work to India, for which Natarajan held ultimate responsibility, was a "disaster."  (Pl.'s App. at 19).  And Rao testified that Natarajan was terminated because of the company's flagging performance and because information was not consistently being provided to the Board.  (Def.'s App. at 151).  Natarajan did not present the Severance Agreement to ATG immediately upon his termination.  In fact, ATG did not receive a copy of it until August 20, 2003 when Natarajan's counsel forwarded the agreement to Eric Grossman, ATG's General Counsel.  (Def.'s App. at 473, 501-02).  The ATG Board disavowed the Severance Agreement as soon as it learned of its existence.  (*Id.* at 394).

Natarajan filed suit against ATG in Texas state court on February 6, 2004.  ATG removed the case to federal court on March 5, 2004.  Natarajan brings claims for breach of contract, fraud, and for violations of the Texas Payday Act.  ATG asserts counterclaims against Natarajan for fraud, conspiracy to commit fraud, breach of fiduciary obligations, and conspiracy to commit breaches of

---

[4] Natarajan contends that he was terminated, while ATG maintains that Natarajan was asked to resign.  The Court will assume, solely for the purposes of this order, that Natarajan's employment was terminated by ATG.

[5] That same day ATG also asked Mehta to resign, or else face termination.  (Def.'s App. at 8-10).

5

fiduciary obligations.[6]  ATG also asks the Court to declare, pursuant to the federal Declaratory

Judgments Act, that the Severance Agreement is not enforceable against ATG.  ATG additionally

filed a third party complaint against Mehta, asserting causes of action for common law indemnity,

fraud, breach of the duty of loyalty, breach of fiduciary duties, and breach of the duty of good faith.

Mehta, in turn, filed counterclaims against ATG for contractual and common law indemnity and

various other state law causes of action.  Mehta has since informed the Court that he and ATG have

resolved certain of his counterclaims against ATG, leaving only his counterclaim for contractual and

common law indemnification.  Natarajan and ATG have filed cross motions for summary judgment.

ATG has also filed a separate motion for summary judgment against Mehta.  All motions are ripe for

review and determination.

## II.  Analysis

### A.  Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate

when the pleadings and record evidence show that no genuine issue of material fact exists and that

the movant is entitled to judgment as a matter of law.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075

(5th Cir. 1994).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Only disputes about material facts will preclude the granting

of summary judgment.  *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material

---

[6] ATG originally also brought a negligent misrepresentation claim against Natarajan in its original
answer and counterclaim filed on March 19, 2004.  ATG since dropped that claim in its amended answer and
counterclaim of June 28, 2004.

6

fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990).  If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case.  Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case.  *Id.*; *Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgement is not appropriate.  *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence."  *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'"  *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting FED. R. CIV. P. 56(e)).  To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant.  *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248.

**B.    Whether the Severance Agreement Lacks Consideration**

ATG first argues that the Severance Agreement is not a binding contract because Natarajan's promise of continued employment was not sufficient consideration.  In support of its argument ATG primarily relies on the Texas Supreme Court's opinion in *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642 (1994), which held that

> [c]onsideration for a promise, by either the employee or the employer in at-will employment, cannot be dependent on a period of continued employment.  Such a promise would be illusory because it fails to bind the promisor who always retains the option of discontinuing employment in lieu of performance.  When illusory promises are all that support a purported bilateral contract, there is no contract.

7

*Id.* at 644-45. *Light* also recognized, however, that a unilateral contract could still be formed where a promise is accepted by performance. *Id.* at 645 n.6.

Here, after Natarajan was offered the Severance Agreement by Mehta in late February/early March 2003, Natarajan continued to work for ATG until the time he was terminated on July 14, 2003. (Pl.'s App. at 61, 65, 18, 19). Thus, by continuing to work for ATG after ATG[7] offered to pay him severance upon termination, Natarajan accepted ATG's offer, creating a binding unilateral contract. Numerous cases, post-*Light*, have recognized that a unilateral contract may be formed when an employee stays on the job in response to an employer's offer. In re *Halliburton Co.*, 80 S.W.3d 566, 569 (Tex. 2002) (at will employee accepted employer's Dispute Resolution Program by the employee's continued employment); *Brown v. Alcatel USA, Inc.*, 2004 WL 1434521, at *2 (Tex. App. – Dallas 2004, pet. denied) ("[A] unilateral contract, though it is not mutual at the time it was made, becomes enforceable if the party seeking to enforce the contract has performed, conferring some benefit on the other party."); *Shaw v. Maddox Metal Works, Inc.*, 73 S.W.3d 472, 479 (Tex. App. – Dallas 2002, no pet.) (finding that employee, by working until his death, accepted employer's offer to pay a lifetime annuity, thus creating a binding unilateral contract); *Helle v. Landmark, Inc.*, 472 N.E.2d 765, 775 (Ohio App. – 6th Dist. 1984) (concluding that employer's "offer of severance pay precipitated the formation of a unilateral contract, and acceptance was effective where [the employees] remained with [the employer] after learning of the new severance policy."). That Natarajan was not certain whether he would leave ATG at the time he was offered the severance deal is irrelevant: "[f]or purposes of consideration, the employee's retention and continued

---

[7] The Court assumes for purposes of the consideration issue that Mehta had proper authority to bind ATG to the Severance Agreement.

8

performance of his work suffices to render the new condition of severance pay enforceable." *Id.*

Thus, ATG's argument that the Severance Agreement is not a binding contract due to a lack of

consideration fails as a matter of law.

## C.     Actual Authority

As an initial matter, the Court will address the choice of law issue only grazed by the parties.

ATG, relying on the Second Circuit's opinion in *Lee v. Jenkins Bros.*, 268 F.2d 357, 363 (2nd Cir.

1959), argues that Delaware law should apply to issues concerning the authority of corporate officers.

As Natarajan correctly points out, however, the conflict of law rules of the forum state, here Texas,

determine which state's substantive law will govern. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S.

487, 496 (1941); *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995).  Applying Texas

law may ultimately require the application of Delaware law here, as Texas has a statute providing

that "the internal affairs of a foreign corporation, including but not limited to the rights, *powers*, and

duties of its board of directors and shareholders" shall be governed by the laws of its jurisdiction of

incorporation.  TEX. BUS. CORP. ACT ANN. art. 8.02  (emphasis added); *Madison P'ship Liquidity*

*Investors 31, LLC v. USAA Properties III, Inc.*, 1998 WL 1782544, at *2 (W.D. Tex. Sept. 28, 1998).

Nevertheless, the Court need not definitively determine whether Texas or Delaware law controls this

case because, as shown below, there is no significant difference between general principles of agency

in those two states.  *See Karam v. Travelers Ins. Co.*, 813 F.2d 751, 752-53 (5th Cir. 1987) (accepting

the assumption that Louisiana, as opposed to Delaware, law applied to determine whether corporate

manager had authority to act on behalf of corporation where identical principles applied to corporate

agency issues in Louisiana and Delaware).

The law does not presume agency.  *Buchoz v. Klein*, 184 S.W.2d 271, 271 (Tex. 1944).  The

party asserting that a particular act of an alleged agent was within the scope of that agent's authority bears the burden of proof by a preponderance of the evidence. *Id.*; *Thermo Prods. Co. v. Chilton Indep. Sch. Dist.*, 647 S.W.2d 726, 732 (Tex. App. – Waco 1983, writ ref'd n.r.e.). To bind a principal, an agent must act with either actual or apparent authority. *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex. App. – San Antonio 1998, pet. dism'd w.o.j.). Actual authority of a corporate officer to bind the corporation to a contract may stem from a statute, corporate bylaws, appropriate action taken by the board of directors or shareholders, or it may be implied from the nature of the officer's position or the custom or habit of doing business. *Templeton v. Nocona Hills Owners Assoc.*, 555 S.W.2d 534, 537 (Tex. App. – Texarkana 1977, no writ); *Ennis Business Forms, Inc. v. Todd*, 523 S.W.2d 83, 85 (Tex. App. – Waco 1975, no writ); *Petition of Mulco Prods., Inc.*, 123 A.2d 95, 103 (Del. Super. Ct. 1956); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 128 (3rd Cir. 1998).

Natarajan argues that ATG's bylaws unequivocally granted Mehta, as President and CEO, express authority to enter into the Severance Agreement. The ATG bylaws describe the powers and authority of the President and CEO as follows:

> Section 4.2: <u>Chief Executive Officer</u>. Subject to the control of the Board of Directors and such supervisory powers, if any, as may be given by the Board of Directors, the powers and duties of the Chief Executive Officer of the Corporation are:
>
> (d) To affix the signature of the Corporation to all deeds, conveyances, mortgages, guarantees, leases, obligations, bonds, certificates and other papers and instruments in writing which have been authorized by the Board of Directors *or which, in the judgment of the Chief Executive Officer, should be executed on behalf of the Corporation*[.]

(Def.'s App. at 490)  (emphasis added).[8]

Natarajan seizes on the latter half of subsection (d) following the disjunctive in support of his view that the bylaws conferred unchecked authority on Mehta to enter into employment-related agreements.  But as ATG points out, while it may be true that the bylaws generally allow the CEO to affix the corporate signature to certain corporate obligations, such powers are not unqualified: the prefatory language of Section 4.2 makes clear that the CEO's powers remain "[s]ubject to the control of the Board of Directors."  (Id.).

ATG argues that, through common practice and its regular way of doing business, the ATG Board exercised its prescribed powers to control the scope of Mehta's authority as President and CEO.  Specifically, ATG contends that the Board limited Mehta's authority to enter into high level executive employment contracts and to make substantial corporate guarantees without prior Board approval.  Mehta concedes that Board approval was required for executive-level employment agreements.  (Id. at 25).  Rao also declared that Mehta did not have the authority to enter into employment agreements for executive management or corporate officers without first obtaining the approval of the Board of Directors and Chaudhari, ATG's Chariman of the Board and sole shareholder.  (Id. at 389).  According to Rao, as a matter of common practice, the Board deferred to Chaudhari's judgment on matters relating to ATG.  (Id. at 389).  Mehta even testified that Chaudhari was one of the sources of his authority.  (Id. at 19).

---

[8] The bylaws also provide that, subject to the direction of the Board of Directors, "the President shall have the responsibility for the general management the control of the business and affairs of the Corporation and the general supervision and direction of all of the officers, employees and agents of the Corporation (other than the Chief Executive Officer, if the Chief Executive Officer is an officer other than the President) and shall perform all duties and have all powers that are commonly incident to the office of President or that are delegated to the President by the Board of Directors."  (Def.'s App. at 490).

ATG maintains that Mehta's own writings reflect that his authority was restricted in certain fundamental ways. For example, in an e-mail exchange that took place on January 9, 2003, Mehta wrote:

> Bhaisahab [Chaudhari], there are a few items that we discussed in India that you wanted me to confirm with you – they are the following:
>
> . . . 3. All VP level and above to be approved by Board for employment contracts
>
> . . . 5. No company guarantees to be done without Board approval (I assume you mean of any sizeable nature . . .).

(*Id.* at 96, 110). Responding to item number 5, Chaudhari wrote back: "YES". (*Id.* at 96). Thus, prior to creating the Severance Agreement, Mehta understood, and Chaudhari confirmed, that Board approval was required for certain high-level employment contracts and "sizeable" corporate guarantees. There can be no question that Natarajan's Severance Agreement fits both criteria. Natarajan was COO of ATG, a higher level position than a vice president. (Pl.'s MSJ Brief at 4) (describing Natarajan's title change from Executive Vice President of Business Development to COO as a "promotion"). He was also the company's highest paid executive. (Def.'s App. at 390). And a contract potentially obligating ATG to a $720,000 severance payment is, if not a complete employment agreement, at least a contract for a key term of employment.[9] Moreover, a corporate obligation of that magnitude could only be characterized as a "sizeable" guarantee[10], particularly for a company experiencing financial difficulties.

---

[9] Rao declared, and common sense dictates, that severance is a key term of an employment contract. (Def.'s App. at 389).

[10] Mehta testified that the Severance Agreement constituted a binding corporate obligation and a guarantee. (Def.'s App. at 37-38).

Other communications further establish ATG's policy and custom of requiring Board and/or Chaudhari approval for executive employment matters. For example, in e-mailing Natarajan during the negotiation of Natarajan's MOU, Mehta indicated that Natarajan would have to accept $240,000 in annual compensation, as opposed to $245,000, because the lower figure was "what was agreed upon by us in good faith, and signed off from Mr. Chaudhari." (Def.'s App. at 292). Mehta also acknowledged in an e-mail sent to Eric Grossman during the negotiation of Grossman's hire as ATG's General Counsel, that "I know we have to get board approval on your joining[.]" (*Id.* at 85, 121). The Board did, in fact, approve Grossman's hire. (*Id.* at 147-48, 392), and Mehta afterwards sent Grossman an e-mail, copying Chaudhari and Natarajan, congratulating Grossman on the Board's approval of his hire. (*Id.* at 334). In another instance Mehta indicated that he would even have to seek Board approval to change an employee's title. (*Id.* at 127).

Natarajan contends that, under ATG's interpretation of the bylaws, the CEO can exercise no judgment, and that all of the CEO's actions are subject to Board approval. Not so. Rather than subjecting the CEO to total subserviency, the bylaws simply allow the Board to limit the powers of the CEO on matters deemed by the Board to be of such importance that they needed to be passed on by the Board. The record evidence demonstrates that executive-level employment agreements and sizeable corporate guarantees fell within this category for the ATG Board.

The limitations imposed by the Board on Mehta's authority thus were not in contravention of the bylaws, but were explicitly provided for by the bylaws in that the bylaws explicitly provide that the CEO's actions are "[s]ubject to the control of the Board." (Def.'s App. at 490). Natarajan's argument that the Board could only restrict Mehta's power through formal action – *e.g.* by amending the bylaws, issuing a resolution, or issuing a formal edict – is unsupported in the law. Courts have

13

routinely held that bylaws may be amended informally. *See* In re *Osteopathic Hosp. Ass'n of Delaware*, 195 A.2d 759, 762 (Del. 1963) (quoting In re *Ivey & Ellington, Inc.*, 42 A.2d 508, 509 (Del. Ch. 1945)) ("Ordinarily, a corporate by-law may be amended by implication and without any formal action being taken by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein; but usually the course of conduct relied on to effect the change must have continued for such a period of time as will justify the inference that the stockholders had knowledge thereof and impliedly consented thereto."); *Keating v. K-C-K Corp.*, 383 S.W.2d 69, 71 (Tex. Civ. App. – Houston 1964, no writ) ("it is a general rule that by-laws may be adopted, or amended, orally or by acts evidenced by a uniform course of proceeding, or usage and acquiescence."). If bylaws may be amended through informal means, it necessarily follows that here, where the bylaws explicitly provided for Board control over the CEO, the ATG Board could exercise control over Mehta through an established course of conduct.

Natarajan argues that ATG has failed to show, under *Osteopathic*, "clear proof of a definite and uniform custom of the company" that was "regularly accepted" and "continued for a period of time" sufficient to justify the inference that stockholders had knowledge of the practice and consented to it. *Osteopathic*, 195 A.2d at 762. The Court questions the relevance of *Osteopathic* and other cases dealing with how corporate bylaws may be amended because here, as stated above, ATG was not amending the bylaws but was rather acting pursuant to them. Nevertheless, ATG has shown by clear and uncontradicted proof that it was customary for Chaudhari to speak with the authority of the full Board and that the Board maintained a consistent policy that executive-level employment contracts and sizeable corporate guarantees needed to be approved by the Board. Although Natarajan points out that the course of conduct urged by ATG spanned only an eight-month period,

14

the custom need be in place only so long as to justify the inference that the shareholders agreed to it. *Osteopathic* 195A.2d at 762. As Chaudhari was ATG's sole shareholder, he obviously consented to company's policy that all executive level employment agreements and sizeable corporate guarantees be approved by him and/or the Board.

Considering the above evidence, the Court finds that ATG has met its burden of showing that no material fact issue exists on the question of Mehta's actual authority to bind ATG to the Severance Agreement without obtaining prior Board approval. Therefore, the burden shifts to Natarajan to show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075. In an attempt to do so, Natarajan claims that Mehta's authority was demonstrated by the fact that Mehta had, in the past, hired and fired "key" ATG employees. Natarajan cites Mehta's involvement with the hire of Amy Lewis as Director of Business Development as an example. Natarajan says that Mehta hired Lewis and negotiated the terms of her employment, which included a $108,000 base salary, a $30,000 guaranteed bonus, a 3% commission on new sales revenue, and severance in the amount of two months base salary plus benefits. (Pl.'s App. in Supp. Resp. to Def.'s Mot. Summ. J. ["Pl.'s App. II"], at 3-7, 10). Natarajan fails to mention, however, that Mehta and Natarajan purposefully kept Lewis's salary at such a level to avoid having to seek Board approval. (*Id*. at 4). According to Lewis, Mehta and Natarajan also told her that she could not get the title she wanted – Executive Vice President – because such a title would require Board approval. (*Id*. at 6).

Nor, says Natarajan, did Mehta need Board approval for the hire of Jody Locke. Locke, however, was hired for a sales position, not for senior management. (*Id*. at 14). And even though Mehta testified that he did not clear the negotiations with Locke through Chaudhari, Natarajan believed that Mehta should have done so: in an e-mail sent to Mehta, Natarajan wrote: "I assume

15

you will or have already got the okay from Mr. Chaudhari?"  (Def.'s App. at 164, 271; Pl.'s App. II at 15)).  As discussed in more detail below in the Court's discussion of apparent authority, if Natarajan himself believed that Chaudhari's approval was required for the hire of an employee for a sales position within the company, it is difficult to understand how Natarajan can now argue that he reasonably believed that Mehta had the unilateral authority to bind ATG to a $720,000 commitment with respect to a key term of his employment.

Natarajan also claims that Mehta had the authority to fire none other than Rao, a fellow Board member.  Mehta testified that he had the power to fire Rao without Chaudhari's permission. (Pl.'s App. II at 16).  But Mehta later backpedaled, testifying that he believed that Chaudhari would not allow him to fire Rao.  (Def.'s Supp. App. in Supp. Def.'s Mot. Summ. J. ["Def.'s Supp. App."] at 20-21).  And in an e-mail dated December 8, 2002, Mehta indicated his belief that Chaudhari would likely fire him if he tried to fire Rao.  (*Id.* at 25).  Thus, far from establishing that Mehta had complete discretion and authority to enter into employment-related agreements with executive personnel, the evidence shows that Mehta's authority in that regard was restricted and that both Mehta and Natarajan either knew or should have known that it was so restricted.

## D.    Apparent Authority

Natarajan contends that apparent authority is "irrelevant" to the Court's determination of Mehta's authority because of his belief that he has demonstrated Mehta's actual authority. Nevertheless, Natarajan makes what is at least a veiled apparent authority argument by contending that he had no notice that Mehta's authority to offer him the Severance Agreement was limited in any way.  "The doctrine of apparent authority is based on estoppel, and one seeking to charge a principal through the apparent authority of an agent to bind the principal must prove such conduct

16

on the part of the principal as wold lead a reasonably prudent person, using diligence and discretion, to suppose that the agent has the authority he purports to exercise." *Chastain v. Cooper & Reed*, 257 S.W.2d 422, 427 (Tex. 1953); *Int'l Boiler Works Co. v. Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977).

Natarajan must therefore demonstrate that ATG's actions could lead a reasonably prudent person, exercising diligence and discretion, to believe that Mehta had the authority to execute the Severance Agreement without Board approval. ATG argues that the company's course of established conduct could not have led a reasonable person in Natarajan's position to believe that Mehta wielded such authority and that, indeed, Natarajan had actual knowledge that Mehta lacked such authority. ATG relies on a number of communications to Natarajan in an attempt to establish that Natarajan knew, or should have known, that significant corporate decisions, including those involving executive compensation, required Board approval. For example, on December 10, 2002, Rao, in anticipation of his impending resignation from the company, forwarded to Natarajan and others a Transition Plan expressly providing that the Board needed to review key terms and conditions of employment agreements. (Def.'s App. at 325, 332). Natarajan was also blind copied on an e-mail from Mehta in which Mehta stated that an employee's request for a title change would have to be brought to the Board. (*Id.* at 127-28). And as previously stated, in a March 17, 2003 e-mail dealing with the potential hiring of Jody Locke for a non-management level position, Natarajan asked Mehta: "I assume you will or have already got the okay from Mr. Chaudhari?", thus indicating that Natarajan was aware that major employment decisions needed to be cleared through Chaudhari. (*Id.* at 123).

Natarajan's experience in negotiating his own terms and conditions of employment with ATG

also should have informed his understanding of the way ATG treated executive compensation matters.  For example, Rao wrote to Natarajan in late August 2002, advising him that shareholder decisions were required for "proper approvals" of various items typically associated with executive-level hiring.  (*Id.* at 197, 309-10).  Responding to this e-mail, Natarajan acknowledged that shareholder approval was required for some issues related to executive level hiring.  (*Id.* at 197, 309).  Because Chaudhari was ATG's sole shareholder, shareholder approval equated to Chaudhari's approval.  The Court finds that the above evidence shows that Natarajan had, or should have had, knowledge that the approval of the Board and/or Chaudhari was necessary for executive employment and compensation matters.  *Tres Palacios Rice & Irrigation Co. v. Eidman*, 41 Tex. Civ. App. 698, 701 (Tex. Civ. App. – 1906) ("[I]t is held with . . . unanimity that one with actual knowledge of restrictive power or lack of authority cannot bind the principal by acting on appearances.").

And even if Natarajan did not have actual knowledge that Mehta lacked authority to bind ATG to the Severance Agreement, he was at the very least aware (or should have been aware) of sufficient information about the company's operations to require him to exercise diligence and discretion to ascertain whether Mehta had authority to enter into the Severance Agreement without Board approval.  *Chastain*, 257 S.W.2d at 427.  Where the act of an agent is of an unusual or extraordinary nature, the party relying on apparent authority is put to inquiry to ascertain the scope of the agent's authority.  *Davis v. Texas Co.*, 232 S.W. 549, 554 (Tex. Civ. App. – Galveston 1921, *rev'd on other grounds*, 254 S.W. 304 (1923)); *J.I. Case Threshing Mach. Co. v. Dallas Chamber of Commerce*, 206 S.W. 206, 206 (Tex. Civ. App. – Dallas 1918, no writ) (internal quotations omitted) (quoting *Manhattan Liquor Co. v. Joseph A. Magnus & Co.*, 94 S.W. 1117, 1119 (Tex. Civ. App. -- 1906, no writ)) ("[I]f the act by which the corporation is sought to be bound is out of the usual

18

course of business of the concern, those dealing with the agent are bound to inquire as to the authority of the agent and deal with him otherwise at their peril.").

The record evidence suggests that the Severance Agreement was unusual and extraordinary in a number of ways. First, the three-year duration of the severance obligation was much longer than was typical at ATG. ATG's Vice President of Human Resources, William Voigt, testified that he has never seen even a six-month severance agreement, much less a three-year severance package. (Def.'s App. at 515). Voigt also stated that, based on ATG's usual practice, he did not believe the Severance Agreement was real when he eventually saw it, and that Mehta would normally involve him in the process of setting executive or senior management terms of employment. (*Id.*). Chaudhari testified that he is unaware of anyone at ATG ever receiving one year of severance pay, and he stated that the company never did and never would agree to provide severance to an employee terminated for cause. (*Id.* at 373-75). Nor could Natarajan himself recall anyone other than himself being awarded more than three months of severance. (*Id.* at 233). Natarajan's final MOU provided for only $100,000 in severance, a far cry from the $720,000 to which he would be entitled under the Severance Agreement, and Natarajan would receive severance under the MOU only if terminated without cause, whereas he would be paid severance under the Severance Agreement whether terminated with or without cause. (Pl.'s App. at 51-52).[11]

Natarajan attempts to demonstrate that his Severance Agreement was garden variety for

---

[11] When negotiating the MOU with Jody Locke, Mehta indicated that ATG might be willing to grant Locke a two-month severance "if we let you go for any changes in business objectives", but he went on to say that "[i]f we let you go due to 'cause' then that's a different story of course." (Def.'s App. at 271-73). In this light, Natarajan's Severance Agreement, which provided for 36 months severance, even for a termination for cause, was extraordinary indeed.

ATG by pointing to the example of Mehta's successor as CEO, Robert Burleigh, who negotiated and reached and agreement with ATG providing for a three-year term of employment with an 18 month severance package worth $390,000.  (Pl.'s App. II at 22).  Not only is Burleigh's negotiated severance package worth nearly half that of the one offered to Natarajan in the Severance Agreement, but Burleigh testified that he believes there was a distinction made in his agreement between a termination with or without cause.  (Def.'s Supp. App. at 7-8).  Moreover, as ATG points out, no employment agreement was ever actually executed between Burleigh and ATG.  (*Id.* at 6), and Burleigh ended up receiving only $61,000 in severance, not the promised $390,000.  (Def.'s Supp. App. at 10-11).  And in any event, Burleigh's example is irrelevant to the present inquiry because Burleigh did not come on board at ATG until July 2003, almost four months after Natarajan was purportedly offered the Severance Agreement.  (*Id.* at 6).  The relevant question is whether Natarajan reasonably relied on Mehta's apparent authority at the time he was offered the Severance Agreement.  Natarajan has put forward no evidence indicating that a $720,000 severance agreement for any termination, with or without cause, was standard practice at ATG at that time.

And even if Burleigh had been hired before Natarajan was offered the Severance Agreement, the relevance of his example is still questionable because Natarajan has neither argued nor offered any evidence suggesting that Burleigh was hired by Mehta, or any other officer, without seeking the prior approval of the Board or Chaudhari.[12]  This is significant because ATG's offer of a generous severance package to Burleigh would only go to the reasonableness of Natarajan's reliance on Mehta's unilateral authority if Mehta, or any other officer, had hired Burleigh *without* the approval

---

[12]  In fact the evidence shows that Burleigh negotiated at least some parts of his compensation package directly with Chaudhari.  (Def.'s Supp. App. at 9).

of the Board or Chaudhari.

Natarajan further argues that the Severance Agreement, by its nature, could not be considered extraordinary because it was merely a "stop gap" agreement intended to simply appease Natarajan until he received the long-promised employment agreement.  In other words, Natarajan appears to be arguing that the Severance Agreement was not unusual because he and Mehta intended it to be a mere temporary measure designed to become inoperative upon the delivery of the employment agreement.  The Court fails to see, however, how the mere possibility that the Severance Agreement could be rendered nugatory makes that agreement any less unusual.  Under its terms, the Severance Agreement would still bind ATG to a $720,000 commitment if an employment agreement was not forthcoming.  Indeed, the very existence of this lawsuit belies Natarajan's suggestion that the Severance Agreement was intended to function *solely* as an innocuous "stop gap" measure – on the contrary it shows that Natarajan believes that the agreement was intended to have, and does have, real teeth.[13]

Natarajan also contends that Mehta's corporate title as ATG's President and CEO alone clothed Mehta with apparent authority to enter into the Severance Agreement.  Some courts have found that corporate titles may create apparent authority in some contexts.  *See Federal Deposit Ins. Corp. v. Texas Bank of Garland*, 783 S.W.2d 604, 607 (Tex. App. – Dallas 1989, no writ); In re *Walt Disney Co.*, 2004 WL 2050138, at *4 (Del. Ch. Sept. 10, 2004).  Such circumstances do not exist

---

[13]  It is also worth pointing out that perhaps the Severance Agreement would have had more of a "stop gap" effect had Natarajan or Mehta actually apprised ATG of its existence.  Knowledge that the company could be on the hook for a $720,000 obligation if it terminated Natarajan seemingly would have acted as a spur to ATG to deliver the long-promised employment agreement.  Strangely, however, neither Mehta nor Natarajan saw fit to inform ATG of the Severance Agreement until August 20, 2003, over a month after Natarajan was terminated and approximately six months after the Severance Agreement was allegedly drafted.  (Def.'s App. at 39-40, 66, 252, 266).

here.  No reasonable person in Natarajan's shoes, knowing what Natarajan knew or should have known about Mehta's limited authority to bind ATG to an obligation of similar magnitude to the Severance Agreement would have relied on Mehta's capacity as President and CEO alone.  At the very least a reasonable person in that position would have taken steps to ascertain the parameters of Mehta's authority.  The undisputed evidence here shows that Natarajan made no effort to do so.  When asked whether he had taken any steps to determine the scope of Mehta's authority, Natarajan responded: "No. Why should I?  He was the president and CEO." (Def.'s App. at 234).  The Court finds that no reasonable juror could find that Natarajan's head-in-the sand, reflexive reliance on Mehta's corporate title alone was reasonable.

The evidence presented by Natarajan thus fails to create a genuine issue of material fact on the question of whether Mehta had the actual authority to enter into the Severance Agreement.  *See Templeton*, 555 S.W.2d at 538 (concluding that there was no evidence in the record of any act on the part of the board of directors or other authorized person to lead a reasonable person to believe that president of board "was invested with the power to execute, without approval of the board of directors, a year's employment contract."); *Nelms v. A&A Liquor Stores, Inc.*, 445 S.W.2d 256, 259-60 (Tex. Civ. App. – Eastland 1969, writ ref'd n.r.e.) (affirming trial court's award of summary judgment to defendants where plaintiff provided no evidence that president of corporation had express, implied, or apparent authority to enter into oral agreement for lifetime employment); *Brown v. Grayson, Enters., Inc.*, 401 S.W.2d 653, 656-57 (Tex. Civ. App. – Dallas 1966, writ ref'd n.r.e.) (finding no evidence in record that would justify an ordinary competent person familiar with the corporation's ordinary methods of business to conclude that contract for lifetime employment contract was within the authority of the Chairman of the Board/CEO and Vice President).

Although ATG's bylaws allowed for the CEO to make certain guarantees for the company, ATG has proven that, pursuant to the bylaws, Mehta's authority in that regard was limited in certain respects by the actions of the Board, and particularly Chaudhari, the company's Chairman and sole shareholder. Specifically, ATG has presented evidence sufficient to establish that, as a matter of practice, Mehta was not authorized to enter into employment-related contracts for high level corporate officials or make sizeable corporate guarantees without seeking prior approval from Chaudhari or the Board. ATG has thus met its summary judgment burden such to throw the burden back on Natarajan to come forward with "specific facts showing that there is a genuine issue for trial." *Schoonejongen*, 143 F.3d at 129 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586). Considering the record as a whole, the Court finds that no reasonable jury could find that Mehta had either actual or apparent authority to enter into the Severance Agreement, and thus there is no genuine issue of fact as to whether Natarajan is entitled to enforce the Severance Agreement against ATG. Accordingly, the Court grants ATG's motion for summary judgment on Natarajan's breach of contract claim and denies Natarajan's motion for summary judgment on that claim.

**E.    Natarajan's Reimbursement and Vacation Pay Claims**

Natarajan also charges that ATG failed to pay amounts allegedly due to him under the company's vacation and reimbursement policies, in violation of the Texas Payday Act and various contracts between him and ATG. (Pl.'s Orig. Pet. at ¶ 13). Natarajan specifically complains that ATG failed to reimburse him for an airline ticket for a trip to India in December 2002 (Def.'s App. at 255) and that ATG improperly excluded his guaranteed bonus compensation from the calculation of his unused vacation pay at the time of his separation from the company in July 2003. (*Id.* at 258-59).

23

As a matter of policy ATG requires its employees to submit receipts to receive reimbursement for expenses incurred on behalf of the company. (*Id.* at 542). Natarajan admits that the submission of receipts was required for reimbursement under company policy. (*Id.* at 161). In December 2002, Natarajan flew to India for an ATG Board meeting. (*Id.* at 257). It was not until July 2003, eight months after the India trip and after Natarajan was asked to resign, that Natarajan submitted a reimbursement request to ATG. (*Id.* at 255, 542). ATG requested that Natarajan provide a receipt or proof of payment. (*Id.* at 542). To date, Natarajan has not provided a receipt. (*Id.* at 255-56, 542). He has, however, offered ATG the check number for the check allegedly used to pay for the airline ticket. (*Id.*). Because the undisputed summary judgment evidence shows that Natarajan has failed to provide sufficient proof of payment, and hence has failed to comply with ATG's reimbursement policy, the Court finds that ATG is entitled to summary judgment as to Natarajan's claim for reimbursement for travel expenses incurred in December 2002. Natarajan has failed to point the Court to any evidence suggesting that Mehta's alleged oral promise that the company would pay for Natarajan's ticket was anything other than a gratuitous promise unsupported by consideration. *See Central Texas Micrographics v. Leal*, 908 S.W.2d 292, 296 (Tex. App. – San Antonio 1995, no writ).

Natarajan also maintains that ATG has failed to live up to its vacation pay obligations. ATG's policy is to calculate unused vacation time pay based on the employee's salary. (*Id.* at 516). It is undisputed that at the time of Natarajan's departure from ATG, he had accumulated 104 hours of vacation pay. (*Id.* at 516, 521). ATG paid him $6857.09 for those hours based on his annual salary of $137,142. (*Id.* at 516). Natarajan contends, however, that his unused hours should have been based not only on his base salary, but also on his guaranteed bonus of $102,857. ATG's

24

vacation policy is clear that payments for accrued but unused vacation is calculated based on "salary", not "bonuses", whether guaranteed or not.  (*Id.*).  The Court therefore finds that ATG's calculation of Natarajan's vacation pay has not been shown to be improper, and it is accordingly entitled to summary judgment.[14]

## F.      Natarajan's Fraud Claim

Natarajan pleads an alternative claim for fraud, arguing that ATG made promises and representations with no intention of performing them in order to induce him to work for the company.  (Pl.'s Orig. Pet. ¶ 14).  The fraud claim appears to be premised on ATG's failure to deliver the employment agreement for a set term that had allegedly long been promised to Natarajan. Natarajan claims that such promises were made during negotiations for his employment with ATG and continued after he had started work there.  (Pl.'s App., at 8, 10, 34-37, 48-49, 50-52).

The elements of a fraud claim under Texas law are: "(1) a material representation; (2) which was false; and (3) which was either known to be false when made or was asserted without knowledge of the truth; (4) which was intended to be acted upon; (5) which was relied upon; and (6) which caused injury." *Shaboon v. Duncan*, 252 F.3d 722, 735 (5th Cir. 2001).  Although ATG moves for summary judgment on the fraud claim on several grounds, the Court finds the last most convincing – that Natarajan has no evidence that he suffered an injury as a result of the alleged fraud.  That is, Natarajan has failed to submit evidence that the employment agreement he was allegedly promised

---

[14] Natarajan's contention that the policy manual referred to in his deposition is actually the manual for Alpha Thought, Inc., a related entity to ATG, is unavailing in light of the unchallenged summary judgment evidence that ATG's vacation pay policy is calculated according to salary.  (Def.'s App. at 516; Natarajan's Resp. Brief at 23) ("ATG is correct in stating that payments for accrued but unused vacation pay is calculated based on the employee's salary.").

would have provided him compensation and benefits beyond those he actually received while employed by ATG. To the extent that Natarajan is claiming that the final MOU reflected the terms to be incorporated into an employment agreement, the Court notes that the $100,000 in severance provided for by the MOU was triggered only by termination without cause. (Pl.'s App. at 52). Natarajan has pointed to no evidence showing that he had been promised a guaranteed term of employment preventing him from being terminated even with cause. Nor has Natarajan presented proof contradicting ATG's evidence that he was terminated for cause. In short, Natarajan has failed to show how things would have been any different had he been provided what he was allegedly promised. ATG is therefore entitled to summary judgment on Natarajan's fraud claim.

## G.    Declaratory Judgment Claims

Both ATG and Natarajan have moved for summary judgment on ATG's counterclaim, brought pursuant to the federal Declaratory Judgments Act ("DJA"), 21 U.S.C. § 2201 *et seq.*, seeking this Court to declare the Severance Agreement unenforceable. Natarajan argues that ATG's claim for declaratory relief should be dismissed because the issue of the Severance Agreement's enforceability has already been joined by virtue of Natarajan's breach of contract claim. While a defendant may generally not file a counterclaim for declaratory judgment pursuant to the *Texas Declaratory Judgment Act* to resolve a dispute already pending before the Court, *see BHP Petroleum Co. Inc. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990), the same is not true of claims brought under the federal DJA. *See Republic Servs., Inc. v. Texas Ecological Servs., Inc.*, 118 F.Supp.2d 775, 776-77 (S.D. Tex. 2000). The federal DJA provides that a declaratory judgment may be used to declare the rights of the parties "whether or not further relief *is* or could be sought[.]" 28 U.S.C. § 2201 (emphasis added); *Repub. Servs.*, 118 F.Supp.2d at 777 ("A declaratory judgment action is a perfectly

appropriate method for determining rights under a contract.").   The Court therefore denies
Natarajan's summary judgment motion to the extent it seeks dismissal of ATG's counterclaim for
declaratory relief.

In light of the Court's foregoing analysis concerning the unenforceable nature of the
Severance Agreement, the Court declares that agreement to be unenforceable against ATG.   ATG
is not entitled to an award of attorney's fees, however.   The federal DJA does not authorize an award
of attorney's fees in a diversity case that would not otherwise be available under a state's substantive
law.   *Century Prods. Co. v. Cosco, Inc.*, 2003 WL 251957, at *7 (N.D. Tex. Jan. 31, 2003) (citing
*Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir. 1988)).   While the Texas
DJA does allow for the recovery of attorney's fees in a declaratory judgment action, *see* TEX. CIV.
PRAC. & REM. CODE § 37.009, "the Fifth Circuit has clearly held that the Texas Declaratory
Judgment Act functions as a procedural mechanism and does not provide the necessary substantive
legal basis for awarding attorney's fees in a federal diversity action." *Century Prods.*, 2003 WL
251957, at *7 (citing *Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998)).   ATG is
therefore not entitled to an award of attorney's fees in this diversity case.   The Court denies ATG's
motion for summary judgment to the extent it seeks attorney's fees in connection with its federal
DJA counterclaim.

**H.     ATG's Fraud and Breach of Fiduciary Duty Counterclaims**

Natarajan's argument that ATG's counterclaims are simply mirror images of its affirmative
defenses that do not seek affirmative relief is refuted by the record.   ATG's fraud-based counterclaims
and breach of fiduciary duty claims are premised on Natarajan's failure to disclose the Severance
Agreement to ATG.   ATG plainly seeks damages as a result of Natarajan's alleged wrongful actions

27

for amounts paid for Natarajan's salary, benefits, and expenses. (ATG's Am. Answer, Affirmative Defenses and Countercl. ¶¶ 23, 27, 37).

Natarajan nevertheless contends that ATG's fraud and fiduciary duty claims must be dismissed because ATG has no evidence to support such claims and because Natarajan did not have a fiduciary relationship with ATG with respect to the Severance Agreement, and hence did not have a concomitant duty to disclose the existence of the Severance Agreement. Natarajan's assertion that no fiduciary relationship existed between himself and ATG is baseless. Black letter law provides that officers of a corporation owe fiduciary duties to the corporation. *Roth v. Mims*, 298 B.R. 272, 288 (N.D. Tex. 2003). Indeed, the very *Disney* case relied on by Natarajan establishes that a corporate officer begins to owe fiduciary duties to the corporation and its shareholders as soon as that officer is hired and begins working for the company. In re *Walt Disney Co.*, 2004 WL 2050138, at *3. Furthermore, a corporate officer is required to fully disclose all material facts within his knowledge relating to corporate affairs. *Imperial Group (Texas), Inc. v. Scholnick*, 709 S.W.2d 358, 363 (Tex. App. – Tyler 1986, writ ref'd n.r.e.). The failure to disclose material facts may constitute fraud where there is a duty to do so. *Robbins v. Capozzi*, 100 S.W.3d 18, 24 (Tex. App. – Tyler 2002, no pet.)

Natarajan maintains that he owed ATG no fiduciary duties to ATG in connection with the Severance Agreement because he was involved in an "arm's length" transaction and remained free to look out only for his own interests. While Natarajan certainly may have been entitled to negotiate the best possible employment terms for himself prior to starting work for ATG, after he was officially hired he owed fiduciary duties to the company. In re *Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 290 (Del. Ch. 2003). Therefore, Natarajan owed a fiduciary duty to ATG as the company's COO as of September 16, 2002, his first day of employment. *Id.* There is no evidence in this case that the

terms of the $720,000 Severance Agreement were arrived at prior to that date. *Cf.* In re *Walt Disney Co.*, 2004 WL 2050138, at *5-6 (finding that Michael Ovitz did not breach fiduciary duties by signing employment agreement and accepting its benefits while serving as Disney President because the essential terms of that agreement were negotiated before Ovitz was officially hired by Disney). On the contrary, construing the facts in a light favorable to Natarajan, the evidence shows that Mehta drafted the Severance Agreement on February 19, 2003 and that Natarajan "accepted" it during the course of Natarajan's service as COO. Thus, the Court finds that Natarajan owed fiduciary duties to ATG at the time the Severance Agreement was allegedly entered into and that fact issues exist as to whether Natarajan breached those duties by failing to disclose the existence of the Severance Agreement. Accordingly, the Court denies Natarajan's motion for summary judgment on ATG's breach of fiduciary duty-related counterclaims.

Natajaran also asserts that "there is no evidence of fraudulent conduct on Natajaran's part because ATG cannot point to any evidence which would indicate that Natajaran was ever instructed or had knowledge that he was required to disclose any employment-related agreements directly to the Board of Directors." (Pl.'s MSJ Brief at 14). The Court disagrees. Natajaran admits that he did not provide the Severance Agreement to anyone at ATG (Def.'s App. at 235), although ATG has presented evidence that normal practices at the company would have dictated that such agreements be provided to William Voigt, ATG's Vice President of Human Resources. (*Id.* at 515).

Also, in April 2003 Rao sent a directive to the ATG executive management team, of which Natajaran was a part, requesting that the team provide the Board with certain records. (*Id.* at 239-40, 240-41, 341, 393, 416-19). Natajaran and Mehta were responsible for working on Rao's request for information relating to "the Organization Model and Major Issues including Risk Assessment."

29

(*Id.* at 473, 497).  By e-mail dated April 2, 2003, Rao specifically requested, with respect to the

"Organization Model", information regarding employee commitments, including "a compiled list of

all outstanding MOU's and EA [employment agreements] were [sic] detailed (personnel name, type,

title/job function, duration, salary, additional compensation)." (*Id.* at 340).  The next day Chaudhari

also sent the following e-mail to Natarajan and Mehta, among others:

> I will not tolerate followings, so do the Board of directors (MY TOLERANCE WILL BE
> ZERO FOR THESE)– . . . TRY TO HOLD/HIDE INFORMATION FROM ME and TRY
> TO BLOCK FREE COMMUNICATION.[15]

(*Id.* at 348).

Therefore, contrary to Natarajan's assertion, ATG has put forth some evidence that

Natarajan was indeed instructed to provide any "employment-related agreements" (Pl.'s MSJ Brief

at 14) to the ATG Board and that he failed to do so.  Accordingly, the Court finds that Natarajan

is not entitled to summary judgment on ATG's fraud- and breach of fiduciary duty-related

counterclaims.

## I.    ATG's Motion for Summary Judgment on Mehta's Counterclaims is Moot

Mehta originally brought counterclaims against ATG for fraud, intentional and negligent

misrepresentation, breach of contract, and contractual and common law indemnification.  (Mehta's

Answer and Third Party Counterclaim ¶¶ 6-18).  Mehta subsequently informed the Court that

certain of his counterclaims against ATG have been resolved.  (Def. Mehta's Unopposed Mot. Leave

to File First Am. Answer and Third Party Counterclaim).  The lone remaining counterclaim is for

contractual and common law indemnification.

---

[15] According to ATG, English is Chaudhari's fourth language.  (Def.'s App. at 364).

30

ATG filed a separate motion for summary judgment seeking to dismiss all of Mehta's counterclaims on various grounds.  That motion is now obviously moot with respect to Mehta's claims for fraud, intentional and negligent misrepresentation, and breach of contract, as those claims have been dropped.  ATG's summary judgment ground with respect to Mehta's counterclaim for contractual and common law indemnification is also moot because ATG's motion was premised on the argument that Mehta was not entitled to be indemnified by ATG for attorney's fees and costs incurred on Mehta's affirmative counterclaims because "Delaware law does not provide indemnification for personal claims brought against the Company that would only benefit the claimant." (ATG's Brief in Supp. Mot. Summ. J. Ag. Mehta at 40).  As Mehta is no longer asserting affirmative counterclaims against ATG, ATG's motion for summary judgment on Mehta's indemnification counterclaim is now moot.  Mehta's counterclaim for contractual and common law indemnification for attorney's fees and costs incurred in connection with his defense of this action and any judgment or settlement paid by him shall remain for resolution at trial.

### III.  Conclusion

For the reasons explained above, the Court DENIES Natarajan's Motion for Summary Judgment in its entirety, DENIES as moot ATG's Motion for Summary Judgment against Mehta, and GRANTS in part and DENIES in part ATG's Motion for Summary Judgment against Natarajan. The Court GRANTS ATG's motion against Natarajan as to Natarajan's contract claim, fraud claim, and all claims for reimbursement and for unused vacation pay.  The Court further DECLARES that the February 19, 2003 Severance Agreement is unenforceable against ATG.  ATG's motion is DENIED to the extent it seeks an award of attorney's fees.

**SO ORDERED.**

SIGNED July 25, 2005


JANE J. BOYLE
UNITED STATES DISTRICT JUDGE